Johnson, Chancellor.
Ordered, That Hugh Thompson, the trustee in the petition named, bring into this court the sum óf money mentioned, on or before the 15th day of January next, or shew good cause why the same should not be brought in: Provided a copy of' the petition, and of this order, are served on him before the last day of this month.
It appears that the service was made as required.
10th May, 1823. — Johnson, Chancellor. — On the application of the complainants, it is Ordered, that on the hearing of the motion made for the purpose of compelling the defendant to bring money into court, that depositions taken before a Justice of the Peace of Baltimore, on three days’ notice, be read in evidence; and, that the complainants be at liberty to prove the contents of any original paper or papers, as well as the entries contained in a book or books in the possession of the defendant; the defendant having first had notice, in writing, three days before the evidence is taken, to *155 produce such paper or papers, book or books: and that the motion be heard during the -next term.
Under this Order, proofs were collected and returned. The hearing of this matter was, by consent, or from other causes, from time to time postponed. The defendant,. Thompson, having prepared and sworn to a supplemental answer on the 21st February, 1823, moved for leave to introduce it at once into the case, without shewing why the matter, therein stated, had not been set forth in his original answer; but- he was not allowed thus to file it. After-wards, on the 31st of January, 1825, the defendant, Thompson, filed a petition, on oath, in which he stated, that he had, through inadvertence in one instance, and for want of a knowledge of some facts, in other respects, - as to which he had since obtained full information, misstated several circumstances^ in his answer, all of which he prayed leave to correct by a supplemental answer. No order was passed on this application; but, soon after it was filed, the parties were heard on the order of the 14th of December, 1822.
' 12th February, 1825. — Brand, Chancellor. — The arguments of counsel, on this petition, to obtain an order commanding Hugh Thompson to bring a certain sum of money into court, have been heard and duly weighed, and the proceedings in the cause have been attentively read and considered.
This practice of ordering money to be brought into court, is one of very, late origin. Lord Eldon is reported to have said in 1803, "I remember when the practice was introduced of making a defendant pay in money, appearing, by his answer or examination, to be in his hands.”(a) But it seems to have been attended with so many beneficial consequences, to have been so often resorted to, and so many of the cases have been reported, that the principles of the rule by which the court is now governed may be considered as fairly and fully developed.- In the investigation of the principles applicable to this petition or motion, as indeed in relation to every other legal inquiry, we should particularly bear in mind, that it is the reason and spirit of cases make the law; not the letter of particular precedents.(b)
It is held to be a fundamental axiom, that the judgment of a court must be the conclusion of law arising from the facts presented *156 to it. And in the application of this maxim, there is nothing peculiar in the character of the court, or in the mode of judicial proceeding, by which it can be at all affected or varied. It is a fundamental principle applicable to all courts, and from which none are allowed to depart. The judgment of a court of law is the legal result of the facts admitted by the parties, or found by the jury: and so too, the decree of a court of chancery is the result, according to principles of equity, arising from the facts found in the bill, answer, proceedings and proofs. Such is the acknowledged foundation of all final and general judgments or decrees.(c)
But interlocutory orders and decrees affecting rights, must, so far as they go, have a similar basis ; because, no court of judicature can arbitrarily make a partial, any more than a total disposition of the rights of things or persons, without such a foundation. The judge can go no farther than to apply the rule to the case, or to pronounce the law upon the facts, either partially or wholly. It is of the very nature of judicial power to be so limited. It is, however, of no importance, as regards this principle, how the facts are made to appear, or in what shape they are presented to the tribunal; whether by confession; by arithmetical calculation; by necessary deduction; or by positive and direct proof. It is enough that the facts are so placed before the tribunal as to preclude all further denial of them. The court may then be called on, in cases like this, to pass an order; or, in other words, to pronounce the equity resulting from the facts. Such are the elementary principles. Let us now bring them near to the case under consideration.
In cases of this sort, it is not necessary that the party moving for the order, should shew an unquestionable right to a part, or to the whole of the money proposed to be called in. It is enough, that he shews an interest in the safety and final disposition of the funds. The general rule is, that the plaintiff is solely entitled to the fund, or has acquired, in the whole of it, such an interest, together with others, as entitles him, in his own behalf, and the behalf of those others, to have the fund secured in court.(d)
A motion, by a party interested, to order money to be brought into court, can only be founded upon the allegation, that the clear conclusion of law from the fact is, that the person, proposed to be called on, has no right or title whatever to hold the money of which he has the possession. And, therefore, the first inquiry is, are there *157 any facts, then to be found in the cause, warranting such a conclusion ? and next; if there are, can the party be allowed, at any future stage of the proceedings, to contradict, or explain them away? It is not necessary to shew, that the person called on is a mere trustee, without any legal control over the fund: it is sufficient, if it appear that he has no equitable right or title to .the money he is called upon to produce. As where an executor admitted a balance in his hands, but alleged, that an action at law was then depending against him, and insisted, that the fund should not be taken out of his hands while he so remained liable to be called on. But the court ordered in the whole balance; and, on a recovery being had, the money was ordered to be paid to the plaintiff in the action, and not to the executor, (e)
It is said, in the books, that orders of this kind were originally confined to cases where the facts were expressly admitted in the defendant’s answer. It is easy to imagine, that their propriety was originally suggested by cases of that obvious and unequivocal character; but the court, having been made acquainted with their beneficial consequences, soon perceived the principle on which they were based; and in a short time threw aside the anomalous and technical notions about the necessity of finding the facts expressly admitted in the answer.
In the case of Freeman and Fairlie,(f) which was so cogently pressed upon the attention of the court by both parties, Lord Eldon says, “ I think it right to say that, under all circumstances, I can take the personal estate to have been in 1791, £2000, and that I may add the accumulations to 1812; hut I have not in this answer any distinct admission, that he has laid out the money in East India securities, in such a way as to enable me to ascertain and order him to bring in what is the fair amount of the personal estate.” And in conclusion, the Chancellor ordered the defendant to bring in the sum of £3680; whence it is clear, that he felt himself at liberty to go as far in pronouncing the conclusion,of law from the facts, as those facts were then, and in that stage of the case, established, and open to no contradiction or explanation in the course of the subsequent proceedings. For, although the Chancellor took much pains to shew, that the defendant had, by *158 his own answer, covered himself with shame; yet the order went no further than the incontrovertible facts would fairly warrant; or, as the Chancellor says, “under all circumstances.” Hence, if the statements, allegations, and then situation of the case, in relation to the motion, are of such a nature as to leave the matter open to be affected by the proofs to be adduced at the final hearing, the court cannot pass any interlocutory order or decree whatever on the subject.(g)
But in the case of Freeman and Fairlie, the facts appear to have been deduced, under qll circumstances, from the answer itself. The first step taken to find facts beyond, but in the immediate precincts of the answer, was, where a schedule was referred to in the answer as containing a correct statement; the items of which schedule, if added up, would shew the sum admitted to he due. Such a form of admission was, therefore, held to establish the facts as unequivocally as if the sum had been distinctly specified in the answer itself. This position necessarily comprehended another case, going apparently one step further, but 'which was, in fact, precisely the same in principle'; that is, where the parly referred in his answer to, and produced a set of books of account, and alleged, that they contained a true statement of facts. If, on referring them to the auditor, he reports, that they shew a certain amount to be in the defendant’s hands,, it will be considered as an indirect, but Sufficient admission of such fact; and the court will order the money to be brought in.(h) But, if no distinct fact can be deduced from the answer itself, laying a foundation for such a motion, and the case is referred to the auditor, and the party, on his examination there, makes admissions of such facts, they will be considered as binding and conclusive as if made in the answer itself. So much, then, for the direct and indirect statements and admissions of the party himself.(i)
There are other cases, which shew that the court has gone much further with the principle, and distinctly manifested a disposition to follow it out in all its bearings. For, where a controverted case of accounts had been referred to the auditor to adjust, and the parties had there fully contested the matter, and the'.report of the *159 auditor shewed a balance in the defendant’s hands, to which he was not entitled: in such case, after the time allowed to except to it, had expired; and after it had been confirmed, an order was granted to have the money brought into court.(j) And this not on the ground of any admission of the party; for the truth might have been, that he contested every item and every point before the auditor; but upon the ground, that the court was presented with facts in that stage of-the case, which had been established in a due course of judicial proceeding, which could not thereafter be, in any manner, questioned or denied by the same party; for an order confirming aueport of the auditor is, in this respect, a judgment of the court. (k)
The objects and inducements for making an interlocutory order, or partial, decision of this kind, are to remove the fund out of danger; to place it in a state of the greatest security for the benefit of all concerned; and, by circumscribing the field of controversy, to accelerate the further progress.of the case, and save costs; since it is evident, the -parties will spin it out while they have the advantage of keeping the money. (l)
Hence -it appears, that those who make this motion, must shew, that, -however much more may be due, they have an interest in the sum of money proposed to be called in; and that he who holds-it in his possession, has no equitable right or title to it whatever. And the facts on which these positions are to be based, must be found in the case as it then stands, either admitted, or so estab *160 dished as to be open to no further controversy at any subsequent stage of the proceedings.(m)
These principles being settled, the next inquiry is, how far the court may allow itself to range through this case in search of those facts, which are to be thus taken as admitted or established. The plaintiffs contend, that the answer of a co-defendant, and certain exhibits and proofs, taken in express reference to this motion, should be read and considered. On the other hand, the defendant Thompson urges, that the very satisfactoiy explanations of what he calls his supplemental answer; or- at least, that matter stated in his petition, filed on the 31st of January last, as the substance of a supplemental answer, which he ought to be permitted now to file, should be taken into view. All these matters must be disposed of before we can safely undertake to bring together what may be considered as the admitted, or established facts in relation to this motion.
The answer of the defendant John Bellj it has be,en urged, may be resorted to, as belonging to the res gesta, to the same subject, either as direct evidence, or for explanation, or illustration. It is, in general, true, that the answer of one defendant cannot be used as evidence for or against another defendant. Whatever may be the extent of the exceptions to this rule, none of them embrace this case;(n) for it is very clear, that Thompson has made no reference to, nor admitted any thing which John Bell has said in his answer: nor has the truth of any one of John Bell’s allegations been put in issue, before the auditor, or otherwise, and conclusively established against Thompson. The answer of John Bell, the co-defendant, cannot, therefore, be allowed to furnish any of those facts on which the decision of the court must be founded on this motion.
The plaintiffs have also directed the attention of the. court to the exhibits and proofs taken, under the order of the 10th of May last, in reference to this motion, and have contended, that, in cases like this, proofs of collateral facts and circumstances may be introduced. But the authorities relied on to sustain this position, point to an important distinction in the classification of cases of this nature.
*161 In cases between vendors and purchasers of real estate, the purshaser, who is not in possession, cannot be called upon to pay in the purchase money until the title is completed; nor will the mere fact of his taking possession, entitle the vendor to call upon him for the payment of the purchase money into court. But if the purchaser, being in possession, exercises acts of ownership, he may be compelled to pay the purchase money into court. And the taking possession, and the acts of ownership, though not mentioned in the bill or answer, are the collateral facts which may be shewn by affidavits, or by proofs taken in a manner similar to those offered upon the present occasion. But, in such cases, that the purchase money is due, and the amount, are facts admitted and established; and whether it should be immediately brought in, or whether the purchaser should be indulged until final hearing, or how much short of that, are questions which depend upon equitable circumstances, not necessarily involved in the principal controversy, that never would be brought into yiew, but by such a motion. They are, therefore, truly and properly collateral circumstances.
But, in this case, the question is, whether, in the direct progress of a case, it has been established or admitted, that a party holding money has no title to it; and is, therefore, liable to be called on in this way. In this class of cases, it is a part of the principal matter in controversy — one of the circumstances of it; as much so as, in the other class, between vendor and purchaser, whether the purchase money was really due or not. And being- necessarily involved in the main question, the court will not stop or delay the regular progress of the case to investigate or. establish it by affidavits or proofs taken out of the regular order. The proof of possession, and the acts of ownership, lay the foundation of that equity which entitles the vendor to make the call for his money sooner than he otherwise could do; and, in that class of cases, it is said to be now quite decided, that, upon motions of this sort, affidavits of such collateral circumstances may be read; and that it was a practice to be encouraged, as it shortened pleading.(o)
But there is an obvious distinction between such collateral circumstances and peculiar equity, and the admission or establishment of facts, which go to shew the real title to the fund proposed *162 to be called in. Therefore, the proofs'and exhibits that have been taken and brought in under the order of the 10th of May last, must, upon the present occasion, be laid aside as altogether inadmissible.
Having thus disposed of the proffered auxiliaries of the plaintiffs, let us now, take a review of those tendered by the defendant Thompson. He insists, that a certain paper he has presented as a supplemental answer, ought to be considered as an amended answer, or that he ought now to be permitted to file a supplemental answer as prayed by his petition.
It is with great difficulty permitted to á defendant to make any alteration in his answer, even upon a mistake. And there is no instance of its having been allowed for the purpose of retracting a clear and well understood admission, (p) It should appear due to general justice to permit the issue to be altered. The rule upon this subject is, that the defendant must move to put in a supplemental answer, and accompany the motion with an affidavit, in which he must swear, that when he put ip the answer, he did not know the circumstances upon which he applies, or any other circumstances upon which he ought to have stated the fact otherwise, or that when he swore to his original answer, he meant to swear in the sense in which he now desires to be at liberty to swear.(q)
The paper tendered as an amended answer, comes within no part of this rule. It is silent as to the causes which occasioned him to omit mentioning the new matter, therein contained, in his original answer ; nor does it say any thing of his not knowing of the new circumstances therein disclosed. It, in fact, purports to be a mere additional or amended answer, proposed to be put on file with the leave of the court, without any previous affidavit, attempting to account for the mistakes or omissions proposed to be corrected or supplied. It must, therefore, be altogether rejected.
But this defendant has now filed his petition, on oath, in a formal manner, praying for leave to file a supplemental, answer. This petition points out, with sufficient certainty, that which the petitioner alleges was a mistake as to- the time of receiving the money firht spoken of in his answer. But that part of the answer, which is thus designated as erroneous, is too indefinite and obscure to lay the foundation of such an order as is asked for by the present motion. It speaks of “ considerable payments,” without specifying whether they were made in bills, or cash, or what was the amount *163 of all or any of them; nor does that part of the answer make a reference to any other document by which the uncertainty might be removed. Therefore, as regards the present motion, whether the answer is suffered to remain as it now does, or is corrected, as proposed, is of no kind of importance.
The Chancellor deems it unnecessary now to decide, whether a supplemental answer should or should not be allowed to be filed to correct this alleged mistake, in reference to the final hearing; since the subject was not distinctly argued and presented to the court with that view.
The second and' third class of errors and corrections, stated and prayed for, are of' the same character, and the same observations will apply to both. The defendant admits he knew, at the time he answered, that all right or claim which he could, in any manner, make to the moneys received from Heyland, could only be derived from the deeds which had been previously made and entered into between him and Heyland. He does not pretend to have received any money from Heyland, in any way, except under and by virtue of those contracts; consequently, his right to hold and apply it, can only be derived from them. His answer distinctly enough states what he believed to be his rights, .as well with regard to the then state of things, so far .as they were known to him, as with reference to all other and future occurrences. If these contracts authorized Thompson to hold the fund, in any Way, for his own use, the original answer, iti which he has, by explicit reference, embodied those contracts, as a part of it, with suitable and apt words for that purpose, contains all that is substantially necessary for his defence; and, consequently, those after extensions of Thompson’s liability, and subsequent ascertainment of the amount of his claim upon the Bells, spoken of in his petition, are more proper and fit subjects for proof and adjustment, on the final hearing, than of a supplemental answer.
A supplemental answer is only intended to correct the allegations of the original answer, or to remove from it dangerous admissions, so as to let in proof on the hearing of the real merits of the case. In this case all the merits are, on this motion at least, to be derived from the contracts ; and the answer covers the whole ground over which those contracts can in any way be extended : consequently, it is in all respects coextensive with all the real merits of the case in eveiy shape whatever; and, therefore, the supplemental answer prayed for cannot be allowed.
*164 While we are in the way of removing or rejecting matters entirely extraneous from the question now under consideration, it may be well to observe, that although the letter of the 10th of November, from John Bell to Heyland, may be used between the Bells and Thompson, and shews the inducement for entering into the two deeds between Heyland and Thompson; yet, as it cannot be allowed to control or contradict those deeds, it must, upon the present occasion, be entirely laid aside.
Having removed from about this motion, all matters which do not properly belong to it, let us now see how the case stands in its simple and reduced form. It is this: — The trustees for all the creditors of Marcus Heyland, appointed under the insolvent laws of this State, together with sundry of his specified creditors, now move the court to order Hugh Thompson, a defendant, to bring into court the sum of eight thousand eight hundred and eighty-nine pounds, Jive shillings'and four pence, sterling money of England, which he had received at various times between the 5th of March, 1811, and the 13th of September following, as specified in the exhibit E, referred to in their bill. Which sum of money, they charge, was received under and by virtue of the last mentioned of the two deeds entered into between Heyland and Thompson, the one dated on the 20th of November, 1810, and the other bearing date on the 8th of January, 1811. To this Thompson answers and admits, that the persons named in the bill are the creditors of Heyland, as stated, and that the two deeds were made and entered into as stated; but he denies, that the second was intended to cancel or supersede the first. And, after making sundry allegations about the true intent, and the proper interpretation of those contracts, and his right to hold and apply the money received under them, to his own use, he then makes a direct answer to the bill as to the money which it alleges to have been received by him as stated in the exhibit E, in these words: “ Defendant did receive from Marcus Heyland, the sums of money mentioned in complainant’s bill,” And further, “ that at the time the money was paid into his hands by Heyland, defendant did not expect it would be appropriated to the payment of Heyland’s creditors in England.”
The true construction of written contracts is a matter which belongs exclusively to the Chancellor: no parol proof can be admitted to explain them, unless' in cases of latent ambiguity. No such ambiguity exists in the present case. Therefore, all the facts relative to Thompson’s right and title to the money which he *165 acknowledges he has received from Heyland, are as fully before the court now as they can be at any future stage of the case, or at the final hearing. The only opening for any doubt or hesitation is as to the true intent and meaning of those deeds. Let us then consider them carefully.
By that of the 20th of November, 1810, it appears, Heyland had become largely indebted to sundry persons for goods purchased of them; that, to secure the payment of those debts, he had drawn bills on the firm of William & John Bell & Co., which they had accepted: who might, therefore, if they, paid those bills, become the creditors of Heyland, in place of those of whom he’bought the goods. After which the Bells transferred and made over this eventual and uncertain claim of theirs upon Heyland, to Thompson. In' consideration of vdiich, Heyland bound himself, by this contract, to pay to Thompson such balance as might be found to be due from him, Heyland, to the Bells, on account of those transactions, or otherwise, upon the fate of the bills being known, and a fair statement of accounts between Heyland and the Bells.
This seems to be the clear sense and substance of this first agreement. From which it appears, that Thompson was put into the place of the Bells ; and, consequently, to the extent of their claim upon Heyland, became his creditor; and, as such, had a right to the funds which were placed in his hands under that agreement. But it is doubtful, from the answer, whether Thompson ever received any thing or not under this first agreement exclusively; and, even supposing he had, the amount not being specified, the court could make no order on this motion-respecting it.
It appears, however, that the sum specified in the. exhibit E, and which is distinctly acknowledged to have been received, came to Thompson's hands after the execution of the deed of the 8th of January; and, consequently, must be controlled ,and regulated according to that contract, and not the first deed of the 20th of November. Hence it becomes necessary to proceed directly to the consideration of the second agreement, dated on the 8th January, 1811.
This contract, after a recital nearly word for word the same, and in sense entirely the same as the first, proceeds to declare, that, in consideration of the premises, Heyland is held bound to pay to Thompson such balance as might be found due from Heyland to the Bells on account of those transactions, or otherwise, up to that time; that Heyland will immediately proceed to account with and *166 pay to Thompson, the amount of the aforesaid acceptances in the same manner as if it had been ascertained, they had been duly paid by the Bells; that on all those payments, Heyland was to be allowed the current exchange; and, further, that Thompson should indemnify Heyland, to the amount paid into Thompson’s hands by Heyland, against all demands that might be rightfully made against him on account of those acceptances, either by the Bells', or by the holders of them.
By this deed Heyland does, most clearly and distinctly, give us to understand, that it was his intention to pay all those 'of his creditors in whose favour he had drawn bills on the Bells. For, with what other possible view could he have stipulated to account with Thompson for the whole amount of the bills, as if they had been actually paid by the Bells ? And with what other understanding was the covenant entered into for an indemnity against all those creditors ? It is most manifest, therefore, that Heyland placed this fund in the hands of Thompson for the use of that class of his, Heyland’s, creditors, the bill holders, whoever they might he.
But, it is alleged that Thompson has a title to - at least a share of this fund as the assignee of the Bells ; and this, it is said, is proved by the recital in this deed, in which it is acknowledged, that the Bells “ had transferred and made over all the amount due by the said Heyland for goods which the said house of William & John Bell & Co. accepted to pay on his account to Hugh Thompson and also by the express stipulation, by which Heyland bound himself to Thompson for such balance as might be found due from him, Heyland, to the Bells, on account of those transactions, or otherwise, to the time of executing that deed.
This position may, perhaps, be more clearly and strongly presented in another form, thus: Heyland stands indebted to sundry persons in the sum, suppose for example, of $16,000, for the payment of which the Bells are his sureties; and, as such, they have paid for him $4,000, and consequently stand in the place of his creditors to that amount. But this claim of the Bells, having been assigned by them to Thompson, he has, thus circuitously, become a creditor of Heyland to the amount of that $4,000, part of the original debt of $16,000. Now, says the defendant’s counsel, Thompson must be allowed to retain at least one-fourth of the fund which has been placed in his hands for the payment of the whole $16,000, since he, in fact, stands in the place of the original creditors to one-fourth of that whole amount.
*167 There is an imposing aspect of equity in this position; and, if the court felt itself at liberty .to make free with the positive covenants of the parties, there might be no difficulty in applying its equalizing principles to this case; but the court is not at liberty to reject or impair the covenant of indemnity in this deed of the 8th of January. By that covenant, Thompson is bound to save Ileyland harmless, not merely against the Bells, but against all the holders of the acceptances, whoever they may be,' to the amount of the funds in his hands. In othér words, he is thus constituted a trustee for the bill holders of the funds in his hands, to the amount of the balance remaining due and unpaid on those acceptances: otherwise Ileyland would not be indemnified against all demands by the bill holders, according to the express terms of this contract. The expressions in this deed, “ on account of the transactions before alluded to, or otherwise, to the time of executing these presents,” were intended merely to refer to the means of ascertaining the extent of H'eyland’s liability to the bill holders, and the amount of the funds which it was .necessary should be placed in Thompson's hands, to meet that liability. The great leading object of Ileyland was to provide for the payment of his own debts due to those bill holders. He had nothing to do with the transactions between Thompson and the Bells, or with the debts due from the one to the other of them. The obvious inducement of Ileyland in making this provision in favour of his bill holders was, some apprehended inability of those who had thus become his sureties.to them. Hence, whatever might have béen the nature or design of the assignment of the claim on Ileyland from the Bells to Thompson, or of any contract between those parties, that transfer, or contract, cannot be permitted to control or contradict the positive and clear stipulations contained in this deed of the 8th of January, between Ileyland and Thompson.
In short, the clear and unequivocal objects of this deed, were to place funds in Thompson’s hands to meet the claims of those of Heyland’s creditors who should present themselves as the holders of his bills, as therein described; and to obtain an indemnity and discharge for Ileyland from every part of those claims, so far as those funds would go. But Thompson does not pretend that he stands here as a creditor of Ileyland, 'in the special character of a holder of all, or any one of the specified acceptances; he is not, by any thing that is alleged or appears, a holder of any one of the designated bills drawn by Ileyland. It might be, that Heyland *168 looked to other resources to pay the Bells any proportion or dividends which they might pay on those acceptances : and this seems plausible. But whatever may have been the intention of the parties as to any matters not comprehended in the deed, that contract, in itself, is clear and unequivocal. The fund in Thompson's hands was to be applied to the satisfaction of the demands of certain designated bill holders; Thompson is clearly and confessedly not one of them; he has, therefore, no right or title whatever to the money which Heyland had placed in his hands for his indemnification against them.
It is, therefore, Ordered, that Hugh Thompson bring into this court, on or before the fourteenth day of April next, the sum of thirty-nine thousand five hundred and seven dollars and eighty-five cents, being the value of eight thousand eight hundred and eighty-nine pounds, five shillings and four pence, sterling money of England, together with legal interesj; thereon from the first day of January in the year eighteen hundred and twelve, which sum, it appears by the admitted and incontrovertible facts in this' case, he had received from the said Marcus Heyland previous to the fourteenth day of September, in the year eighteen hundred and eleven, for the use of said Heyland?s creditors, as specified in the proceedings in this case; and which the said Hugh Thompson ought, within a reasonable time thereafter, to have paid to the said creditors : Provided a copy of this order be served on the said Thompson, on or before the twenty-fifth day of the present month. And it is further ordered, that the said sum of money, with. the interest thereon, when so brought into court, be deposited in the Farmers Bank of Maryland to the credit of this case, subject to further order.
The defendant Thompson, having been advised, that he was not entitled to an appeal from this order, without any previous application to the Chancellor to be allowed to appeal, on the 17th of February, 1825, presented a petition, to the Senate, praying that the General Assembly of Maryland would pass a special act allowing him the benefit of an appeal; and the plaintiffs on the next day presented a counter petition to the Senate, which were both together referred to a committee, who on the 23d of February, 1825, made the following report:
“ The committee to whom was referred the petition of Hugh Thompson, and the counter petition of John McKim, jun’r., Thomas L. Emory¡ and others, report — That they have considered the *169 subject referred to them with the attention which the large pecuniary amount, and the importance of the principles involved in its considerations demand. The petitioner has been proceeded against in chancery by the counter petitioners and others, as a trustee, holding funds which, by the principles of equity, as it -is said, he is bound to distribute to sundry creditors of a certain Marcus Hey-land. The defendant denies the trust alleged, and claims the amount in his hands as due to himself. The Chancellor, by an interlocutory order, has decided, that certain papers filed as exhibits in the cause, prove the trust to exist as alleged, and has directed the fund, amounting to about $70,000, to be brought into court. The petitioner alleges, that the interlocutory order is wholly a manifest violation of the principles of chancery law, in ordering money to be deposited into court by a defendant, claiming title to it, and more especially'in adopting such an order as a means of coercion, by which to compel a defendant to a final decision pf his cause, without the proof which his counsel may think proper and necessary; but' is also injurious to him in the highest degree, without any corresponding benefit to the adverse party, whose interest, it is said, will be promoted by allowing the defendant to give such security as will ensure the prompt payment of the money, with the accumulating interest, at the termination of the cause. With regard to the correctness of the decree or order, the committee intentionally avoid any expression of opinion. The high authority of the Chancellor, and the opinions of the able and distinguished counsel who conduct the cause of the petitioner, are opposed, and the committee gladly avail themselves of the absence of any necessity to pass between them.
“In whatever other respects a difference of opinion is found to exist, it is admitted on all hands, that from an interlocutory order to bring money into court, there is no appeal by the existing laws. Indeed, the nonexistence of such a right, is the sole ground of the application now before the Senate. The question we are called on to determine, is, whether it be advisable to interpose a special legislation to correct an alleged error of the Chancellor. It will at once occur, that the affirmative of this question necessarily involves the previous investigation of the case, and the decision that the Chancellor has erred. It would seem to be obvious, that if a defendant is not injured by a judicial decision, he can with no propriety claim from the legislature a special enactment for Ms relief.
*170 “ The committee cannot believe that it will comport with the separate and independent power, which the Constitution has cautiously secured to the legislative and judicial departments of the government, that the legislature should erect itself into an appellate tribunal for the revision of a judicial opinion. The organization of the legislature, and its mode of proceeding, are certainly by no means calculated to ensure to parties litigant, a correct or intelligent decision. If in the progress of the judicial return, and the developement of legal principles, and their application to peculiar circumstances, they shall be found productive of results which the people of the State deem to be oppressive or inconvenient, it will at all times be the legitimate province of the legislature, to repeal or modify the law. Some of the most salutary provisions of our code have originated from the inconvenient operation of general principles in their application to particular cases. But in this, as in all other instances, individual injury is to be submitted to,, when it can only be avoided by endangering the public weal.
“ The committee are entirely satisfied, that it will be inconvenient, and may in very many cases be extremely oppressive to defendants in chancery, to be compelled to bring money into court until a final decision upon their claims to it; and still more inconvenience and oppression, they believe, might grow out of the principle, that an order to bring money into court can be used by the Chancellor as a compulsory process, whereby litigant defendants shall be coerced into an early decision of their rights; and they would suggest the propriety of legislation upon the subject. But they still retain the opinion, that injurious as may be the consequences of this decision to the petitioner, yet the mischief of special legislation to interrupt the regular operation of the course of judicial proceeding, and the assumption of powers which by the Constitution have been declared to belong exclusively to an independent department, is of much greater concern to the community. Such a precedent would open the door to the introduction of a class of cases not more to be dreaded by the number, than by the difficulty of distinguishing their various grades. From a state of perfect certainty, through all the intermediate stages of conviction, to a state of perfect doubt, as to the correctness of the judicial decision which shall become the subject of relief, the legislature may expect to find itself called on to execute this portion of its newly assumed power.
*171 “ The committee, in all the views in which they have been able to consider this subject, find themselves compelled to adopt the conclusion, that the prayer of the petitioner ought not to be granted. They therefore recommend the adoption of the following resolution :
“ Resolved,, That the petitioner have leave to withdraw his petition.”
“ Mr. Claude moved to strike- out the report, and the question was put and determined in the negative. The question was then put, Will the Senate concur in the report and assent to the resolution? Determined in the affirmative.”(r)
2d May, 1825.- — Bland, Chancellor. — In this case the defendant, Hugh Thompson, by his counsel, on the 11th of April last, moved the court to grant an appeal from its order of the 12th of February last, and thereupon filed and offered an appeal bond for the approbation of the Chancellor. The motion was permitted to lay over until the plaintiffs could be heard; after which their counsel appeared, and asked to be allowed further time to reply, in writing, to the defendant’s motion, which was granted; and on the 28th of the last month, a written argument, on the part of the plaintiffs, in opposition to the motion, was accordingly submitted to the Chancellor. The parties having been thus heard, the motion has been deliberately and maturely considered.
The Chancellor took some pains, after a very careful research into all the authorities within his reach, to explain the reasons and grounds on which he founded the order of the 12th of February last. The greater part of the debatable ground, occupied in the discussion of the motion for that order, was as to its foundation,— as to the kind of admissions, or state of things which would warrant its being made. The court was, therefore, explicit upon that subject. But, whether such an order was interlocutory or final— a “ decretal order” or not, was neither mentioned in argument, nor considered by the court. The investigation of the nature of the basis of such an order being a matter of much importance, was however, made with great care; because, upon its being ascertained, whether that basis- was solid and uniform, or loose and shifting, depended the very interesting question presented in that argument — whether such orders were likely to be attended with good or ill consequences; or whether they were, or were not capa *172 ble of being used as instruments of oppression ? And it was, on finding that the authorities required the most broad and solid foundation, no less clear and strong than that of a final decree itself, that the court was perfectly convinced of their great utility in all cases where there was a proper foundation for making them, and that they were no more capable of being abused, or applied to improper purposes, than final decrees themselves.
But the foundation, or basis of an order, does not .determine its effect upon the controversy or the parties. An admitted, or incontrovertible state of facts, is required as the foundation of an order to bring money into court. As the foundation of an order to account, it must appear that a computation is necessary relative to the matter on which the court may be called on to decree; and to lay a proper foundation for an order to pay money out of court, the party claiming it must show a clear title in himself. But no inference can be deduced from the nature of the basis of an order as to its true character, that is, whether it be interlocutory or final, a decretal order, or otherwise. Such questions can only be determined by the order itself, considered in all its relations and bearings upon the parties and upon the case.
Whether an appeal can be allowed, as moved for, must depend altogether upon, whether the order of the 12th of February last is or is not a " decretal order,” within the true intent and meaning of the act of 1818, ch. 193, s. 1. The English authorities explain, with tolerable accuracy, the difference between interlocutory and final decrees in Chancery, but the phrase, “ decretal order,” seems to be variously applied, and to have no settled or distinct meaning or application. The term “ order” is almost always used in sjieaking of those general or special directions by which all suits in chancery are governed, controlled, or facilitated throughout, or in the course of their progress from beginning to end; and, the term “ decree” is most generally applied to the decisions of the court upon some or all of the rights of the litigating parties. Hence it would seem, that a “ decretal order” can only be such an order as finally determines some right between the parties.
But we have a satisfactory and conclusive authority of our own State upon this question. The Court of Appeals, in the case of Snowden v. Dorsey,(s) say, “ that an appeal will not lie from a mere interlocutory order by which nothing is finally settled between *173 the parties;” and “ which was only preparatory to a final decree, and was liable to be reviewed at pleasure’;” or “where nothing is done conclusive upon the Chancellor, but the order remains open, subject to his final disposition, and may be rescinded on motion.” Let the order of the 12th of February last be tested by this decision of the Court of Appeals, and every difficulty must be at once removed; it is, upon the face of it, merely preparatory to a final decree, — nothing is done conclusive upon the Chancellor. The order directs, that the money “.when so brought into court, be deposited in the Farmers Bank of Maryland to the credit of this case, subject to further order.” The place of the deposit of the money is ordered to be changed. It is to be made more secure for the benefit of all concerned, subject to be disposed of by any future order, or by the final decree, in such proportions and in such manner as the right and title of the parties shall require. This order, of the 12th of February last, is not then, according to this opinion of the Court of Appeals, a “ decretal order.” And the construction, thus given by that court, to the phrase “ decretal order,” in the act of 1818, accords with that which has been always heretofore given to it by this court.
The practice of requiring and giving bond, on an appeal from a decree of the Court of Chancery, was very carefully inquired into and considered, by the Chancellor in Ringgold’s case ;(t) and in the course of his investigations in that case, he became perfectly convinced, that there was no legislative enactment of this State relative to appeal bonds from the decrees of the Court of Chancery. The act of 1729 only declares, that the provisions of the act of 1713, on the subject of appeals, so far as they relate “ to the prosecution of them,” shall apply to chancery cases; and, so far as any thing may be inferred from what was done by the Court of Appeals in the case of Smith v. Dorsey, at June term 1824, (for the court gave no reasons for their act,) it appears to be the opinion of that tribunal, that there is no act of assembly requiring a bond to be given on an appeal from the Court of Chancery. But it would be obviously impossible, or very difficult, to apply the provisions of the act of 1713, relative to appeal bonds, on appeals from judgments at common law, to appeals from the multiform and complex decrees of the Court of Chancery. It has, however, been the constant practice to require bond with surety on appeals from *174 the Court of Chancery, where the thing decreed would be put or continued in jeopardy, or at risk. The practice upon this subject, as heretofore settled and established, the Chancellor has neither the disposition nor the power to alter in any respect whatever.
But if an appeal would lie. from such an order as that of the 12th of February last, and if the Chancellor could, in no case, on an appeal, as in England, order the money to be paid into court, to remain there pending the appeal, and if he were bound, as has been contended, by positive legislative provisions to grant the appeal, on the parties entering into bond with approved surety, then it would be utterly futile to ask for, or obtain such an order in any case whatever, even in the plainest and strongest that could be imagined; since the party thus called on could always suspend its execution at pleasure. The order in this case calls on the party to bring the money into court, that the court itself may have it placed in perfect safety for the benefit of all concerned ;(u) not that he shall merely give security for the payment of it. But if the party could appeal from such an order, and suspend its execution, by giving an appeal bond, then he could, in effect, prevent the court from going farther than barely demanding security for the payment of the money. The consequence of which would be, that such orders would operate partially and not alike upon every citizen; upon those most wealthy and best able to comply, they would be mere cobwebs; but upon those least able to find security they would have their full and just effect; they would operate as rigid injunctions. Upon the whole, the Chancellor is perfectly .satisfied that an appeal cannot be allowed, and therefore,
It is ordered, That the motion of Hugh Thompson, to grant an appeal from the order of this court, made on the 12th of February last, directing him to bring a certain sum of money in to court, as therein set forth, be and the same is hereby overruled and rejected.
After which, on application, and its being shewn that the order of the 12th of February had been served as required, an attachment was ordered against the defendant Thompson, returnable forthwith; but it so happened, that the process was never served *175 on him. At the June term of 1825, of the Court of Appeals, the defendant Thompson applied to that court for an order prohibiting the Chancellor from proceeding pending the appeal, upon which an order was passed and certified to the Court of Chancery accordingly. As to which, see 6 H. & J. 321, 334.
The case having abated by the death of Thompson, the parties filed an agreement in the Court of Chancery, under which Robert Oliver, as executor of Thompson, appeared as a party in his stead j and upon which the following order was passed.
24th January, 1827. — Bland, Chancellor. — Ordered, that this case be and the same is hereby referred to the award and arbitrament of David B. Ogden and Francis S. Key; and if they differ, to choose a third person, and the award of any two, when filed, to be entered as a decree of this court, according to the terms of the aforegoing agreement.
After which the arbitrators made and filed the following award:
" This cause having been, by the agreement of the parties, and the order of the Chancellor, referred to us, we have examined the record and considered the statements of both parties; find do thereupon make the following award:
“ The controversy submitted to our decision by the parties in this case depends upon the construction to be given to the contract of the 8th January, 1811, between Heyland and Thompson. The preceding contract of 20th November, 1810, and the letter of John Bell to Heyland, which produced it, the letters of Hugh Thompson, and the other evidences of his acts and declarations subsequent to the contract, have been considered by us.
“ We are of opinion, that the construction of the contract, which the complainants adopt as the ground of their claim, cannot be' sustained. We think it was intended to " assign” to Thompson, to secure him for his liability for the Bells, whatever Heyland owed, or should owe to the Bells, for the acceptances they had paid, or should pay for Heyland; that it was meant by the parties, that the full amount of the acceptances made by the Bells for Heyland, should be paid, under that contract, by Heyland to Thompson; and that Thompson should apply what was thus paid, as far as those acceptances should be met by the Bells, to secure himself to that amount, and as far as they were not paid by the Bells, to pay them. Thus would Heyland’s indemnity under the contract be complete. What the Bells should pay he would be clear of, by the payment, which *176 they directed to Thompson; what the Bells should not pay, Thompson, out of the funds received from him, was to pay.
“ What Thompson received under this contract from Heyland, was £8889 5s. 4d., and his engagement was to indemnify Heyland from claims by the Bells, or the bill holders, “ to an amount equal to the sum which might be paid over to the said Thompson by virtue of said arrangement.” We therefore consider, that if it appears, that the Bells paid on account of those acceptances, an amount equal to the sum received by Thompson from Heyland; and if it further appears, that Thompson is liable for, or has paid, on account of his engagements for the Bells, an amount equal to what he has received from Heyland, he has complied with the contract.
“ The first appears to be admitted. The sums paid to the bill holders by the Bells, amount to a greater sum. Thompsons account against the Bells shews an amount due to him greatly exceeding, the sum paid him by Heyland. The bills of the Whittles and Tucker, (notarial copies of which are admitted,) amount, with damages and costs, to about that sum. These bills Thompson had endorsed and taken up, and the Bells were liable to him on them, and it was for them, it appears, he entered into the liability; to them he had a right to look; and although there is an expression in one of his letters, that he meant first to get the money from the Whittles, if practicable, yet we do not think he was bound by that expression to follow the Whittles with strict legal diligence. There is no evidence to shew, that there has been any such engagement, or such negligence in enforcing it against the Whittles as should absolve the Bells. There are other items in Thompson's account, which we did not understand were objected to.
“ Upon the whole, we award and determine, that neither the complainants, the original bill holders, nor the assignees of the Bells, nor those of Marcus Heyland, have any claim upon the funds received by Thompson from Heyland. And that a decree shall therefore be made dismissing their bill; but without costs. 12th February, 1827.”
A decree was passed accordingly on the 26th February, 1827.

 Mills v, Hanson, 8 Ves. 91; Gilb. For. Rom. 179.

 Fisher v. Prince, 3 Burr. 1364; Doe dem. Lancashire v. Lancashire, 5 T. R. 62.

 Gilb. For. Rom. 35.

 Freeman v. Fairlie, 3 Meriv. 29.

 Yare v. Harrison, 2 Cox. 377; Mortlock v. Leathes, 2 Meriv. 491; Strange v. Harris, 3 Bro. C. C. 365; Blake v. Blake, 2 Scho. & Lefr. 26; Rutherford v. Dawson, 2 Ball & B. 17; Yates v. Farebrother, 4 Mad. 239; Johnson v. Aston, 1 Sim. & Stu. 73; Rothwell v. Rothwell, 2 Sim. & Stu. 217.

 3 Meriv. 29.

 Strange v. Harris, 3 Bro. C. C. 365; Peacham v. Daw, 6 Mad. 98.

 Mills v. Hanson, 8 Ves. 68, 91; Hatch v.-, 19 Ves. 116; Wood v. Downes, 1 Ves. & Bea. 49; Roe v. Gudgeon, Coop. Rep. 304.

 Quarrell v. Beckford, 14 Ves. 177; Vigrass v. Binfield, 3 Mad. 62.

 Gordon v. Rothley, 3 Ves. 572; Fox v. Mackreth, 3 Bro. C. C. 45.

 Brown v. Barkham, 1 P. Will. 653.
Taylor v. Wood — 25th July, 1815. — Kilty, Chancellor. — The report of the auditor in this case was filed on the 25th of March last, and having laid during the present term without any exception being filed thereto, is liable to be confirmed, or otherwise acted on without further notice. And it is now taken -up, on motion of the complainant. The balance reported as due from or in the hands of the defendants, Owens & Smith, is $13,925 29. Against this there are some further credits, which are extended, but not yet established or allowed, which, if allowed, would reduce the balance to $11,837 35.
On the present state of the accounts, it is Ordered, that the said Owens & Smith do forthwith deposit in the Farmers Bank of Maryland, to the credit of the estate of William Robb, the sum of $13,337 35, which will be liable to a deduction and return of the further credits for expenses and commission, if allowed, and also the sum of $1509, claimed on account of A. Stewart, if established. The balance then remaining will be subject to the order of the court, on a further report to be made by the auditor as to the claim of the creditors, including the defendants.

 Roberts v. Hartley, 1 Bro. C. C. 56; Gordon v. Rothley, 3 Ves. 572.

 Montgomery v. Clark, 2 Atk. 378; Rogers v. Rogers, 1 Anstr. 174; Quarrell v. Beckford, 14 Ves. 177; Vigrass v. Binfield, 3 Mad. 62; Rothwell v. Rothwell, 2 Sim. & Stu. 217.

 Oshorn v. U. S. Bank, 9 Wheat. 832; Field v. Holland, 6 Cran. 24.

 Clarke v. Wilson, 15 Ves. 317; Cutler v. Simons, 2 Meriv. 103; Morgan v. Shaw, 2 Meriv. 138; Crutchley v. Jerningham, 2 Meriv. 502; Bramley v. Teal, 3 Mad. 219; Wickham v. Evered, 4 Mad. 53; Blackburn v. Starr, 6 Mad. 69; Wynne v. Griffith, 1 Sim. & Stu. 147; Gill v. Watson, 2 Sim. & Stu. 402.

 Pearce v. Grove, 3 Atk. 522.

 Livesey v. Wilson, 1 Ves. & Bea. 149.

 The Chancellor’s case, post 000.

 6 H. & J. 114.

 Ante, 5.

 It is admitted on all hands, that the court has, in all cases, the power to invest any money in its hands so as to keep it productive pending the litigation; and therefore there can be no ground to object, that if the money were called in, there would necessarily be any great loss of interest in a case like this. — Latimer v. Hanson, ante, 51.